Morning everyone, this is American Home Mortgage matter that was postponed from earlier date. Good morning. May it please the court. My name is Ben Ackerley and along with Jason Harbour and Michael Duesenkell, we represent the Appellant Credit Agricole Corporate and Investment Bank New York Branch, which was formerly known as Calion New York Branch. Is that microphone working? I don't see it. I don't know. Maybe you need to get a little closer. Yes, it is working. Get a little closer, if you wouldn't mind. We just thought, before we started, we wanted to talk about this, hope that things went okay with your family matter. We all have children and we were all struck by your letter, but hopefully that's... Well, thank you very much. I wanted to thank Mr. Dorsey, too, for consenting to the continuance and for you all for granting it. I very much appreciate that. Well, things like that help us keep our priorities in line. Even though there's a lot of money here, it's only money. The issue before the Court is what does the phrase, commercially reasonable determinants of value, mean, as it is used in Section 562 of the Bankruptcy Code? Mr. Agerly, I'm not very sophisticated in these matters, so I hope you'll bear with me when I ask you from a practical standpoint, what's at issue here? As I understand it, your client purchased a portfolio of mortgages. It has the portfolio of mortgages. It's getting income, stream of income from the portfolio, but it doesn't want to sell the portfolio, at least at this time, but it wants damages. It sounds to me a little bit like it's eating its cake and still having it. How is that wrong? Well, let me address that. What's at issue here is what is known as a repurchase agreement. We understand that. We've read it. My client is the agent for a number of banks who purchased mortgages from the debtor. Under a repurchase agreement, it was kind of a warehouse arrangement, where we purchased the mortgages, which enabled them to finance them, and then they were going to buy them back. Under the repurchase agreement, they had an obligation to buy them back. If they defaulted on that obligation, Calian had a claim for the repurchase price plus whatever interest had accrued on the repurchase price. But you haven't sold them. The market is, as the bankruptcy court, as you all agree, dysfunctional. You still have the mortgages. You're still getting money from the mortgages, but you want damages because you say it's worth less than it was before. The bankruptcy code, Your Honor, in Section 562 mandates that the damages be measured as of a specific date, and that's to prevent speculation on the mortgages going up and down. Judge Slover's question is, you're getting money. You're getting money from these mortgages as we sit here. Each month, you're getting cash. And why isn't that good enough? I think maybe you need to explain what your bargain was and how you're being harmed by just getting cash. Our bargain, Your Honor, was to be paid the repurchase price plus interest. In a quick timeframe? In a quick timeframe. Aren't repo agreements under a year? Generally, generally. But I mean, you ask how we're getting hurt. How are you hurt by what the situation is right now? Well, Your Honor, we're hurt because we're owed about $900 million. That depends on what commercially determinants, plural, of value under 562 means. That is correct. But the repurchase, the bankruptcy code mandates that we value them on a specific date unless there's no commercially reasonable determinant on that date. Now, what the bankruptcy court was concerned about was that we were somehow going to get a windfall because we were holding onto the mortgages. That is quite impossible. Explain that. Explain the practical reality of this financing. Okay. Well, it's impossible because, first off, Your Honor, it assumes that we're going to hold the mortgages for the entire 30 years. Secondly, it assumes that on our deficiency claim, whatever that may be. And that's not your deal. Your deal is not to hold. Your deal is to get rid of them. That's what you bargained for, correct? No. Under our contract, we had the right to hold them. We had the right under the contract to hold them and give them a credit for the market value. That's in the repurchase agreement. We had that right. But what I'm saying is there's no windfall here because under the bankruptcy code, under Section 559 of the bankruptcy code, which is the other one that's here, if we liquidate the mortgages and sell them and there is an excess over the repurchase price, that belongs to the debtor. So there's no situation here where we enjoy a windfall. It's the debtor who is protected here because 562 prevents an unreasonable value being placed on the mortgages before there's a commercially reasonable value. So, in fact, as the evidence in this case was, on the 562A measuring date, which we contend is not the proper measuring date, these mortgages were worth somewhere between zero and ten cents on the dollar. At the time that we considered being commercially reasonable, they were worth 50 cents on the dollar. But if you acknowledge that you can hold on to them for the term and the discounted cash flow is what it is, how are you being hurt? Well, we don't, Your Honor, for instance, acknowledge that we can't hold on to them because the repurchase agreement says we can hold on to them if we elect to hold on to them. Upon a default, if there had been no bankruptcy here, upon a default, we can hold on to the mortgage for the entire term. We have to give them a credit of what the market value is if we elect to do that. We have to give them a credit of what the market value is for the term. Or we can proceed to liquidate the mortgages. And if we liquidate them for more than we are owed, that excess goes back to the debtor. If you hold on to these mortgages and you get the money over time, why is not discounted cash flow the appropriate determinant of value? Your Honor, it's not the appropriate determinant of value just because of the clear language in Section 562. 562 contemplates that there are going to be times when there is no commercially reasonable determinant of value. And because discounted cash flow always gives you a value, it can't be a commercially reasonable determinant of value. But the debtor's expert said that was the way to value it. And in fact, isn't that ordinarily the generally accepted the discounted cash flow method, isn't that generally accepted in the area of finance? I believe so. Discounted cash flow is used in valuing mortgages, but it's used in connection with the market value as well. And here it was done without any regard to the market. Yeah. Not at all. But you say that it should have said market or price. And if the discounted cash flow method is a generally accepted way to measure the value of a mortgage portfolio, why? And the bankruptcy judge said, I listened to the testimony, the evidence, and said, yep, that's a good way. What's wrong with what the bankruptcy court did? Because the discounted cash flow, Your Honor, valued these mortgages at par. I mean, valued them over a billion dollars when they couldn't be sold for that amount. That doesn't mean it's wrong. When you say it couldn't be sold for that amount, but then on the other hand, you're saying you can hold on to them. And if you hold on to them, then the value, it seems to me, would be the discounted cash flow. Well, if you hold on to them, not to realize the discounted cash flow, Your Honor, you hold on to them to realize an increase in value of the market so you can sell them for more. Why? I mean, people go out into the market, and what they want is a stream of income. And that's what you have, a stream of income. You agree that these mortgages are giving your client income, right? Correct. Okay. So why isn't that a reasonable determinant of value? If I want to go out, if I have a little money, and I want to go out and get something for it, then what I look for is the income that those assets will give me. Why isn't that reasonable? It's not reasonable, Your Honor, because in order to realize the discounted cash flow valuation of these mortgages, you have to assume there are going to be very few defaults, and we're not in that economy. You have to wait 30 years to realize it, and banks don't typically hold them for 30 years. But you can pick whatever date you want. You stipulate it to four dates. But if you're holding them, you can sell them whenever you want. The market may go way up. And if we sell them, Your Honor, and we recover more than we are owed, that money belongs to the better. Sure. Mr. Agarly, isn't your real answer, and maybe I'm wrong, but isn't your answer that you're in the business of dealing in repo agreements? You're not in the business of holding mortgages. That's correct. And your bargain here was to hold them and send them back, and that liquidity and the ability to turn these back is what your deal was. That's correct. So the idea that you're holding these mortgages, the fact that you could, wouldn't it mean that you're in the business that you're not in? Or am I wrong? I mean, I was thinking the real answer. Sending these back and that liquidity is important. So I was actually buying your argument. But by virtue of your saying you hold on to them, if you hold on to them, discounted cash flow works. If we hold on to them, though, Your Honor, we have to give them a credit for their market value. That doesn't really help you, though, does it? We understand that you're not going to get a windfall on that side. It sounds to me like you want them to guarantee your investment in the sense that if it goes up, you win. If it goes down, you win. If it goes down, you hit them for the deficiency. If it goes up, you sit on the increase, but you give them the amount over the agreement. But you still end up with an insured investment. Your Honor, to all due respect, I believe that argument is incorrect. No one's insuring our claim here. No one's insuring our claim. Congress, I think, was very careful in 562 to say, you've got to measure these claims on a certain date, whether you sell them or not. That's when you measure them. Now, let's assume for a moment that we had sold the mortgages on the acceleration date for $0.10 on the dollar. We would have had a $900 million deficiency claim in the bankruptcy. You would have taken the risk, but you're not taking the risk now. Now you have no risk. You're just holding on to them. You're getting the stream. And what's the risk? We may not have. I would disagree about the risk because I think this is a risky economy that we're in. But we contracted to be owed a certain amount of money, and we haven't been paid that amount of money. And until we're paid that amount of money, it seems to me we've got the risk. I know your brief says that Congress intended 559 and 562 to prevent illiquidity caused by the automatic stay. I mean, that was the whole point behind those provisions. Isn't the illiquidity here caused by market forces? Well, if I understand your question correctly, Your Honor, I think it's our whole position in this case that the value of these things was strictly affected by market forces. And that's what affected the value of these mortgages. Why didn't you sell? Why didn't we sell? Because we knew we'd have a large deficiency claim, which would probably get paid two or three cents on the dollar. And so we decided to hold on to the mortgages until the market has improved a little bit. Is that clear, that it's two or three cents on the dollar? I think it's pretty clear, Your Honor. What's the money that's at stake here? If you're correct, what will the debtor have to part with? It would have to pay us. I mean, our claim we contend is $478 million. Right, but two or three cents on that. Congress, you say that it's market or sale price that is what's at issue. Congress didn't say that. I mean, Congress knows how to write words in a statute, and it's our obligation to follow the words that Congress used, not the words that Congress didn't use, but could have. And that's a much simpler way to express what you say the statute means. They just say if market value rather than commercially reasonable determinants, and again, that plural determinants suggests there's got to be something other than market value that Congress had in mind. Your Honor, I respectfully disagree. Commercially reasonable determinants of value is a broader term than market value. That's right. The reason Section 559 used market value is because 559 only deals with the situation where there's an excess over the repurchase price, so it's presumably commercially reasonable when you have an excess over the purchase price. 562 only deals with a deficiency claim, and Congress was very careful to use the phrase commercially reasonable determinants of value because if they just said market, we could have sold them for 10 cents on the dollar on the acceleration date and contended that was the market, but would that have been commercially reasonable? We did not think so because there was an issue about clear title. There was an issue about who was getting the money. We couldn't give reps and warranties. Why isn't discounted cash flow commercially reasonable? Discounted cash flow is not commercially reasonable because it has nothing to do with the market, and that's so clear in this record it's beyond dispute. It has nothing whatsoever to do with market. It's purely a mathematical formula. I've run way over my time, and I'd like to preserve a little bit. Thank you. Did you reserve some time? Okay, great. Thank you. You have some more time, Mr. Rackley. May it please the Court. Good morning. My name is John Dorsey. I represent American Home Mortgage Holdings, Inc. at all, the debtors below and the appellees before this Court, and I'm here with my colleague today, Michelle Budasek. I just wanted to make three quick points. She did all the work. It usually works that way. The person who doesn't talk did all the work. She did do all the work, Your Honor. She did an excellent version of the first draft of this brief. I had to make very few changes to it, so she's a very good lawyer. Remember that when it comes. Yes, it's coming up very soon too. Just a note. Just wanted to make three points with regard to oral argument this morning. First, we're not asking this Court to do anything other than what Caleon itself did outside the context of this litigation, and that is to value the mortgage loans based on a discounted cash flow value. Where did it do that? The evidence below showed that when Caleon was determining how to record these mortgages on its books and records, it used a discounted cash flow value. That's for purposes of financing. That's a financial measure that you can put on your books. If you don't have an appraisal, you can use that for purposes of a financial statement. That's not probative of the market, is it? Well, I don't think it's probative of the market. I think you're right, Your Honor, because they actually asked their auditors for an opinion. Can we use discounted cash flow to put this on our books and records, or do we have to use the market value? And our auditors said, use discounted cash flow. The question was that goes to, I guess it's 114, but there's a general accounting principle that that method is consistent with. And the question suggests that the reason that was okay was because in terms of how you track this stuff on paper under the generally accepted accounting principles, it's okay. That's correct. I'm not sure if that goes to Mr. Ackerley's claim about whether or not under the terms of the repurchase agreement in 562, it's consistent. Using that generally accepted accounting principle is consistent with congressional intent in drafting 562. I think that's the problem here. Well, Your Honor, I only raised that point to show that it is commercially reasonable to value these mortgages based on a discounted cash flow value. What do they use that for? In other words, once they put it on their books at the discounted cash flow basis, what does that then result in? That results in how they carry it on their books and records and whether they have to take a loss on those mortgage loans, which when the SNC, the Shared National Credit, came in and looked at these mortgage loans and said, Callion, given all of the problems you're saying you have with these mortgage loans, you should write them off at 100%. And Callion said, no, no, no, we don't have to do that because there really isn't any problem with these mortgage loans. Mr. Dorsey, your own expert testified, Mr. Clayton. He said, unless there's something very, very strange going on in the market, the market value of the assets and the discounted cash flow value of the assets will be very, very similar. Isn't that an admission that there's something very strange going on in the market? And when Congress said you use this other provision when there is no commercially reasonable determinant of value, such as when there's a dysfunctional market, why isn't that so probative of what we have here? Words out of your own expert. Well, we don't disagree, Your Honor, that there was a disruption in the marketplace. Everybody agrees it was a disruption. And our expert testified that the disruption in the marketplace was not reflective of the actual true value of those mortgages, because if you looked at the discounted cash flow value, they still far exceeded what the market value was. But if we determine that Congress was talking about disposition, and commercially reasonable, that term, can you tell me when that's used in a context other than disposition? Well, in 562, I believe it's used in the context of just determining the value of that repo agreement at the particular time, whether it was the date of liquidation, termination, or acceleration. So it's not necessarily a disposition. And if you look at Section... Okay, that's putting the rabbit in the hat. But can you give me an example of the use of the term, is the term of art commercially reasonable, in a context other than disposition of some type of asset? Other than the disposition? Not off the top of my head, Your Honor. I cannot think of one. It comes up in the UCC when they're talking about you have to use commercially reasonable ways to terminate or to sell an asset once the secured party takes it back. And Congress itself said the references to commercially reasonable are intended to reflect existing state law standards relating to a creditor's actions in determining damages. That's correct, Your Honor. How could that, when we're talking about creditor's actions and commercially reasonable has to do with what a creditor does in disposing of an asset, how can we then say, oh, but this theoretical calculation is what they intended? Because we've got to figure out what Congress intended. I understand, Your Honor. And I think it does relate to Callion's actions in this case. They chose from the very beginning, at the time they accelerated the repurchase agreement, before the debtor was even in bankruptcy, they had made the decision they were going to hold these mortgage loans. That's what the evidence showed at the hearing. So you're saying commercially reasonable means the way they put it on their books? I think the fact that they made the decision to hold the mortgage loans and realize the income from those mortgage loans goes to the question of what is commercially reasonable for purposes of determining what the deficiency claim against the debtor is going to be. And there has to be some certainty as to what that deficiency claim is going to be. We can't wait for Callion to decide to go ahead and sell these in the marketplace at some point in time down the road. And the idea that they have to hold these for 30 years overstates the position. The evidence showed, in fact, the stipulated facts at the hearing were that in the one-year period from August of 2007 when the debtor went into bankruptcy and August of 2008 when Callion says that was the first time there was a commercially reasonable market value, they collected $222 million on these mortgage loans. And they continued to collect from August of 2008 until the time of the hearing in May of 2009. What percentage is that? I didn't work it out. It's about 20%, Your Honor. 20%? In that one-year period. Is it an income stream? Yes, Your Honor. Wow. And if you take into account what they earned after August of 2008 through the date of the hearing, that was another, according to their fact witness, another $53 million. It raises that to 25% that they'd already recovered on these mortgage loans. Did Judge Sanchi talk about, I mean, what you're arguing is what's commercially reasonable is depending upon the context. And you look at what a creditor has done, and then you determine, based on what they're doing with the asset, what's the value to them. Judge Sanchi really didn't get into that. I mean, I think it's an interesting approach, but he didn't reason that way, did he? I'm trying to remember his, it was a long opinion, Your Honor. I don't remember him getting into that specifically. But he didn't look at what they actually did with the asset, and I think that's actually an interesting way of looking at it, that it's contextual, if you will. You're saying it comes out to the same place. Correct, Your Honor. And if you look at 559, it's clear that what Congress, and I think Your Honor was correct when you were talking with Mr. Ackerley, that Congress knows when to put market value in, when it means market value. And 559 uses market value in determining how to calculate what a debtor would get back from a repo counterparty. But that deals only with the repo agreement. When you get to 562, there's a laundry list of types of property, master netting agreements, swap agreements. They may not, you know, there may not be markets. So, I mean, it would seem to me when it says, if there are not any commercially reasonable determinants of value, referring to all these different kinds of things, security clearing agencies, and it would seem to me if they did say market value, you might have a problem with figuring out a market for some of these. Well, I think some of those things, Your Honor, would only have a market value. Some, but others. There's no way there's not an income stream earned from those. I'm sorry, Your Honor. That's all right. Let me ask you, I'm still stuck on your 20% and your 25%. 20% of what, how are you valuing that? If you look at the total amount that was owed under the repurchase agreement at the time of the acceleration was approximately $1.1 billion. Billion, yeah. But then they paid off 70-something million and some other, it got down to 900-something million. Yes, Your Honor. There was a period of time when the debtor was holding the income that was coming in because they were still technically the servicer for those mortgages. So what you're doing is you're taking the asset, let's say it's worth a billion dollars for our purposes, and you say they're getting X number of dollars each year, and that's where you got your 20% and then your 25%. No, the 20% would have been the actual amount received from August 1st. But it's 20% of what? 20% of the total $1.1 billion. Okay, all right. Now, so if you're right and they're getting in 20% the first year and 25% the next year, in four years they'll get back the whole value. That's exactly right, Your Honor. We don't know exactly because there may be an increase in default rates and things like that, but that's the way mortgages work. We all know we all have mortgages and they're all front-loaded with interest, so you pay mostly interest in the first five or six or ten years. Now, on the default, didn't Clayton say that he's discounting 50% for the default? He did take into account a default rate. And, in fact, the evidence at the hearing, and it surprised Judge Sanchi, was that Dr. Clayton had actually performed a discounted cash flow for each and every one of the mortgages contained in the portfolio and took into account a potential default rate. So how did that work? So what is the 50% of? I just want to understand the mechanics of what was going on. Well, Dr. Clayton couldn't know in the future what the default rate was going to be, so he had to pick a number. He hypothesized. He hypothesized about a potential. And then what did he do with that? I'm trying to work out the math. He then used that to calculate what the discount rate would be for the cash flows associated with that. So when Mr. Ackerley told us that they have to worry about the default rate, that was taken into account in his testimony? He did take a default rate into account, Your Honor. Now, he did testify on cross-examination with Mr. Ackerley that he didn't take into account the potential increase in the default rate going into the future. You mean they would default more? Correct. But that's consistent with Section 562, which says you have to look at the value of the repo agreement on the date that they accelerated it. And as Dr. Clayton testified, the only way to do a discounted cash flow is to look at the default rate on that specific day, not looking at what might possibly happen in the future. But the methodology is not really an issue. There's no attack on the methodology. That's correct. Yes, they put on no evidence to rebut Dr. Clayton's testimony about how to perform a discounted cash flow value. And so the bankruptcy judge accepted that? Yes, Your Honor. And I was going to point out, in Section 559, there is a scenario that Congress understood could happen where you might have a liquidation without a disposition. There's language in 559 that says in the event of a liquidation, any excess of the market price is received on liquidation of such assets. And then in a parenthetical it says, or if any such assets are not disposed of on the date of liquidation of such repurchase agreements at the prices available at the time of liquidation of such repurchase agreements from generally recognized sources, or the most recent closing bid quotation from such a source. We don't have any closing bid quotations. We don't because the market was in disarray at the time. Well, and all this does is permit them to proceed to liquidate. I mean, that's the purpose of this section. Yes, Your Honor, true. But Congress understood that there might be instances where you are liquidating, but you haven't disposed of it yet. Now, if they had liquidated and come up with a huge deficiency claim, would you then argue that their liquidation was not commercially reasonable because they should have held on to these mortgages? Absolutely, Your Honor. 562 is how you determine the deficiency claim, and 562 uses the term, was there a commercially reasonable determinative value on the date of the liquidation? And if they had liquidated them at $0.10 on the dollar, when if they could have held them for four, five, six years and recovered the entire amount due, then it would be fundamentally unfair and unequitable to have. So you have no problem with reading commercially reasonable as related to a disposition, but your position is it wouldn't have been commercially reasonable? That's correct, Your Honor. I heard part of the question earlier, though, that the parties to these kinds of agreements are really not in the business of holding these things. The whole concern of Congress and the nature of the transaction is rapid liquidity. You don't buy the portfolio with the idea of sitting on the mortgages in the portfolio until they mature. That's not what you're trying to do. That's the way the market was supposed to work, and maybe that's why the market collapsed because they were doing this kind of process in the marketplace all the time. You buy them, you hold them, your profit derives from the cash flow with what's in your portfolio, not your swapping paper back and forth. Correct. And as Mr. Ackerley correctly pointed out, under the terms of the repo agreement here, they had the right to hold these loans if they made that decision. So obviously Callion, when they drafted the contract, understood there might be a situation where we don't like the market price, so we're going to hold them instead and earn the impact. And be made whole. And be made whole. Well, except if you add up the income that's coming in, they're going to be made whole anyway. Yes, you are. Absolutely. So it's not a bad deal. No, not for Callion. I'm out of time unless your honors have any other questions. Thank you very much. Thank you very much. Let me just address some of the points which were raised by Mr. Dorsey. His definition of commercially reasonable is not consistent with the well-known understanding of what commercially reasonable means. It deals with disposition in the marketplace. The phrase came from the Uniform Commercial Code, and it's in Article 9 of the Uniform Commercial Code, which deals with how a secured creditor must dispose of the collateral in order to have a deficiency claim. And the disposition of the collateral must be commercially reasonable. So also the legislative history to 562 talks about applicable state law standards for determining commercially reasonable. Now, those are two standards in my view. One is the contract standard, which I talked about in my direct, which said that upon a default, if we were going to liquidate the collateral, we had to do it in accordance with market conditions, what the market would pay for them. And so that's a commercially reasonable standard. And, of course, the other commercially reasonable standard is the acceptable UCC definition of commercially reasonable. So we think, I mean, when I read this statute to begin with and saw commercially reasonable determinants of value, the first thing that came to my mind was Article 9 of the Uniform Commercial Code because that's been beat into our heads for about 40 or 50 years. But on the other hand, you said yourself that had you proceed to a disposition, you would have had a huge deficiency claim. Correct. And as we learned from Mr. Dorsey, he would have said that your disposition was not commercially reasonable because you would have been doing that when you had a good option. I mean, there are lots of times when there are mortgage foreclosures and you can say, oh, you shouldn't have foreclosed because of the cash flow, because you have mortgage payments. Well, of course, they're all in default, so the only commercially reasonable thing to do is to foreclose. But here, where you didn't attack the methodology of the expert as to what the discounted cash flow really is, you're kind of backing yourself into the thought that auctioning off as compared to this discounted cash flow is not commercially reasonable, aren't you? Judge, the reason we didn't attack the expert's methodology is our clear reading of the statute was that Congress was looking at market, what you could sell the mortgages for, not a discounted cash flow, and there is absolutely no dispute. You could have sold. Yes. You could have sold. And as Mr. Dorsey … It would have been really low. You could have sold. There was a market, correct? Our expert testified that they might be worth as much as $0.10 on the dollar. We could have sold, Your Honor, but the sale would not have been commercially reasonable because it was so low. Under the UCC. That's right. So if we had sold at $0.10 on the dollar and Mr. Dorsey had objected and we were standing here today arguing about it, he would have said $0.10 on the dollar is not commercially reasonable. But you made a choice. The point is that you had a choice to make, and you made a choice, which is to use the asset to deliver a stream of income. That's commercially reasonable, and that's what the expert said. The expert said, well, it generally accepts that if you have assets and you can get money for them, then go ahead and do it. If you read Dr. Clayton's testimony, start to finish, he said very clearly, and Judge Rendell recognized this, he said very clearly that if you've got a dysfunctional market, you hold. You hold the mortgages, and his value is premised on holding mortgages to maturity. I can't say it enough, Your Honor, but it is undisputed in this case that a discounted cash flow valuation will give you a value on these mortgages if there are atomic bombs going off in Philadelphia. They will do that. But it might not be commercially reasonable depending on what you're getting. Now, these mortgages, even, do you agree, by the way, that the expert used a 50% default rate in evaluating possible? He took the mortgages that were then delinquent, that were then delinquent, the ones that were delinquent, and applied a 50% default rate. In fact, we've experienced much higher default rates since August of 2007. And some property may have gone up in value, too. Not where I'm from, Your Honor. Well, but we don't have any figures on that, right? We don't. That's not in the evidence. I mean, fundamentally, I mean, our argument to you all is that if you all accept the discounted cash flow value as Judge Sanci accepted it, i.e., you use a discounted cash flow when the market is dysfunctional and you can't sell the mortgages, then you are writing out of existence Sections B and C of 562 with respect to mortgage agreements and any other sort of payment document that's covered under 562 that has regular monthly payments. You're simply writing it out of existence. You're making the statute. Why is that? Because that will always be the case? Always gives you a value. Discounted cash flow always gives you a value. Not disputed. Judge Sanci didn't dispute it. They don't dispute it. Their expert doesn't dispute it. That might be the result, but why isn't that a commercially reasonable discounted value? Because it should be very close to market. It should, but their expert said, when the market is dysfunctional, it's not. But dysfunction is different from, you know, poor, perhaps. Well, my time is up, and I think our briefs make the case, and I hope we've helped you. Thank you very much. Thank you. Thank you. Thank you. Interesting. Very interesting, if we can say that about a paper case like this. It was interesting. And very instructive. Thank you very much for your argument and your briefing. We'll take the matter under advice. Thank you. Thank you. Thank you.